# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

ZANE WISEMAN,

     Plaintiff,

v.                                  Case No. 8:21-cv-2743-TPB-AAS

PROGRESSIVE PALOVERDE
INSURANCE COMPANY,
a foreign corporation,

     Defendant.

_____/

## ORDER GRANTING "PROGRESSIVE PALOVERDE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT"

This matter comes before the Court on Defendant "Progressive Paloverde Insurance Company's Motion for Summary Judgment." (Doc. 40). Plaintiff Zane Wiseman submitted a response in opposition. (Doc. 48). Defendant then submitted its reply. (Doc. 54). Upon review of the motion, response, reply, court file, and record, the Court finds as follows:

## Background

Plaintiff alleges that Defendant Progressive Paloverde Insurance Company engaged in bad faith handling of a personal injury claim that Plaintiff asserted against Progressive's insured, Kimani Rush. Progressive's conduct in handling the claim is undisputed; the parties' disagreement turns on whether Progressive was required to have handled the claim differently. Bad faith claims are evaluated based on the totality of the circumstances and the facts of the individual case. *Cadle v. GEICO Gen. Ins. Co.*, 838 F.3d 1113, 1123 (11th Cir. 2016) (citing *Berges v.*

*Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004)).  Accordingly, a detailed discussion of the factual background is necessary.  For the reasons discussed below, based on the totality of the circumstances, no reasonable jury could conclude Progressive acted in bad faith under the specific facts presented here.

### The Accident and Rush's Policy with Progressive

On June 19, 2017, Wiseman was severely injured in a motor vehicle accident involving Kimani Odonga Rush, a 25-year-old college student driving a 2003 Infiniti.  (Doc. 40 at 1-2; Doc. 48 at 1-2).  A wheel and tire dislodged, traveled across the median, and struck Wiseman's 2005 Toyota Camry, which was traveling in the opposite direction on I-275 near Tampa, Florida.  (*Id.*).  The wheel from Rush's vehicle hit Wiseman, rendering him unconscious, and causing his vehicle to collide with a fence and then a tree.  Wiseman suffered catastrophic bodily injuries in the accident.  (Doc. 48-2 at 4).  Wiseman's parents retained an attorney, Maureen Deskins, to represent him and pursue claims on his behalf.[1]  (Doc. 40 at 3; Doc. 48 at 2).

At the time of the accident, Rush was insured by Progressive under Policy No. 910480359, purchased in Louisiana, which included bodily injury limits of $25,000 per person and $50,000 per accident.  (Doc. 40 at 1-2; Doc. 48 at 1).  Rush reported the accident on the day it occurred, telling Progressive that he thought the vehicle behind him hit his vehicle, causing his left rear tire to dislodge and strike

---

[1] Because Wiseman was incapacitated following the accident, his parents retained counsel in anticipation of their appointment as Wiseman's guardians.  (Doc. 40-5).  Unless otherwise noted, the Court refers interchangeably to Wiseman and his parents as "Plaintiff."

Wiseman's vehicle.  (Doc. 40-2 at 1-2).  The police officer on the scene, however, concluded that Rush's wheel dislodged prior to the rear-end collision – a finding Rush disputed but which an examiner commissioned by Progressive preliminarily confirmed upon inspection of Rush's vehicle.  (Doc. 40-2 at 8, 17; Docs. 40-6; 48-2).

***Progressive Begins its Investigation***

On June 22, 2017, Progressive opened Rush's claim and assigned adjuster Emily Carman to handle it. [2]  Carman spoke with Rush the next day regarding coverage, liability, and loss.  Carman indicated in her contemporaneous claim notes that Rush was aware she had been assigned due to the liability allegations and potentially significant injuries to Plaintiff, that Carman would investigate liability and make decisions on Rush's behalf to protect him, and that Carman would keep him informed regarding her investigation.[3]  (Doc. 40-2 at 6).

Carman then discussed Rush's living situation.  Carman's notes indicate that Rush informed her he lived in Louisiana where he went to school, and before that he had lived with his grandparents in Pensacola, Florida.  (*Id.*).  He took classes in

---

[2] Carman is also referred to in the record as Emily Oliver or Emily Hattaway.  (Doc. 52 at 5).  For purposes of this Order, the Court refers to her as Carman, because that is how her name predominantly appears in the record.

[3] An insurer's claim notes allow adjusters – whoever is handling a specific claim – to electronically document work done on a case, including notations of conversations and other communications.  *See* (Doc. 40-2; Doc. 52 at 13-15).  During her deposition, Carman based her testimony as to the handling of the claim on her notes and her recollection.  Each side has filed copies of the claim notes in connection with Progressive's summary judgment motion.  The notes are admissible as business records under Fed. R. Evid. 803(6).  *See, e.g.*, *United States v. Armstrong*, 619 F.3d 380, 384-385 (5th Cir. 2010) (finding that an insurance adjuster's log notes qualified under the business records exception to the hearsay rule); *Petro v. Travelers Cas. & Sur of Am.*, 54 F. Supp. 3d 1295, 1307 (N.D. Fla. 2014) (relying on the insurer's notes regarding its valuation of the claim to conclude that the insurer did not act in bad faith.).

both Louisiana and Tampa, traveling back and forth, and was currently in Tampa for a class. (*Id*.). He told Carman he had been in Tampa since May, but he had no residence in Tampa and stayed on campus when he took the class there. (*Id*.).

In fact, it appears that Rush's living arrangements were unstable and in a state of flux during this time. He testified in his deposition that he lived in Chicago until he was 21 and then moved to Louisiana for college, where he remained until 2016. (Doc. 42 at 13-14). He then relocated to Pensacola, Florida, at around the age of 23, where he lived with his grandfather. (*Id*. at 15, 29). On the day of the accident, Rush, at odds with his family, was driving from Pensacola with all his belongings to visit a friend in Tampa with the intention of relocating there. (*Id*. at 79-81). He stayed at the friend's apartment in Brandon about a week. (*Id*. at 84-85). On June 23, as noted above, Rush gave Carman his address in Louisiana and said he had no permanent residence in Tampa. (Doc. 40-2 at 6). A week after that, Carman learned from Rush that he was then staying at a Homewood Suites by Hilton in Brandon. *See* (Doc. 40-2 at 13; Doc. 52 at 95-96). On July 3, Rush relocated to California, where he remained homeless for eight or nine months. (Doc. 42 at 155-57).

On June 23, 2017, Carman mailed a letter to Rush, via regular and certified mail, to Rush's Louisiana address. (Doc. 40-3). The letter explicitly informed Rush that his policy might not be sufficient to satisfy the bodily injury claim, advised him that he had the right to hire an attorney to represent his personal interests, requested notification of any umbrella or excess liability coverage, and enclosed an affidavit concerning additional coverage. (*Id*.).

***Plaintiff's Policy Limits Demand and the Perceived Racial Slur***

On June 26, 2017, Plaintiff's attorney Maureen Deskins faxed a letter to Progressive, with attention to Carman, informing Progressive that she represented Plaintiff and requesting an insurance disclosure. (Doc. 40-4). Carman spoke with Rush again on June 29. She discussed with him the fact that Plaintiff had retained counsel and was alleging significant injuries, and that Carman was working to protect him and investigate his claim. She also discussed the hiring of an accident reconstructionist. (Doc. 40-2, at 11). At 3:45 p.m. that day, Deskins faxed a letter to Carman making a demand for payment of Rush's full liability limits within 10 days of receipt of the letter (i.e., no later than July 9, 2017), as well as the execution and delivery of a financial affidavit attached to the demand, the completion of which was a condition for settlement. (Doc. 40-5). In a separate letter, Deskins also requested preservation of Rush's vehicle and related items. (*Id.*).

Both letters from Deskins showed copies were also mailed to Rush at the Pensacola address listed on his driver's license, which was his grandfather's address. The affidavit itself showed Rush's name as "Kimani Rush," as did the preservation letter. Notably, however, the demand letter requiring the financial affidavit showed a copy to "Kimani Coonga Rush." Rush's middle name is "Odonga." As discussed below, this misspelling of Rush's middle name, which he perceived as a racial slur, ultimately prompted Rush to refuse to complete the financial affidavit. Progressive documented its receipt of Deskins' demand in the claim notes as of 5:44 p.m. on June 29, 2017, and updated the notes the following day to reflect Deskins'

terms, including the "condition of financial affidavit."  (Doc. 40-2 at 13).

### *Progressive and Counsel Reach Out to Rush Regarding the Affidavit*

On Friday, June 30, 2017, Carman spoke with Rush and told him about the demand from Wiseman's lawyer.  Carman indicated she would send him copies of the demand letter, affidavit, and preservation letter.  She also advised Rush that she had retained Stacy Yates, an attorney with the Pennington law firm, to assist Rush.  (*Id*. at 14).  After speaking again with Rush, Carman informed Yates that Rush was staying at a Homewood Suites by Hilton in Brandon, Florida.  (Doc. 40-7).  Carman forwarded the demand letter, financial affidavit, and preservation request to Yates and provided Yates with Rush's phone number, email address, and the address of the hotel.  (*Id*).

Also on June 30, 2017, Andre Sesler, an attorney at the Pennington firm working with Yates, spoke with Rush by phone and then followed up with a text message asking Rush to call him.  (Doc. 40-9 at 1).  When Rush failed to call, Sesler texted Rush again on July 2, apologizing for bothering him on a Sunday, but advising Rush that it was "urgent that we speak."  (*Id*. at 2).  The text explained that the injured driver had hired an attorney to bring a claim against Rush, and that they were under a deadline of four days, with the Fourth of July holiday approaching.  (*Id*.).  Rush responded by text to Sesler, telling him that he should speak to Rush's father first on July 4 and that Rush's father would initiate the call.  (*Id*. at 3-4).  Sesler replied, stressing that they were trying to "act fast" to resolve the claim and needed to have the document filled out, signed, and returned by Wednesday, July 5.  Sesler stated he hoped to speak to Rush or his father the next

morning.  (*Id*. at 4).  Rush responded, "That's fine," but provided no further information.  (*Id*. at 5).

The next day, Monday, July 3, 2017, Sesler's legal assistant forwarded to Rush by email a copy of Deskins' preservation letter, time-limited demand, and financial affidavit in anticipation of reviewing the documents with Sesler during the planned meeting, which ultimately never took place.  (Doc. 40-10 at 6-18; Doc. 41 at 29-30).  The email address used by the assistant for Rush was "kimanir1@gmail.com.'  *See* (Doc. 40-10).  Rush testified in deposition he communicated during this time by cell phone and email, and that this was the email address he used.  (Doc. 42 at 114, 157).

The assistant also emailed Rush two letters from Yates: (1) a letter indicating that Progressive had retained the Pennington firm to "represent and assist you in regards to the above-referenced matter," noting that "[i]t appears from the demand letter that they are requiring you to complete the financial affidavit to even consider resolution of this matter," stating that "time is of the essence and a response is required on or before July 7, 2017," and asking Rush to contact her "as soon as possible" to discuss the matter further;  and (2) an excess letter indicating that Yates had been "retained by [Progressive] to represent it and help facilitate the execution of the financial affidavit."  (Doc. 40-10 at 2-5).  This letter stated that she could not advise Rush as to "any uninsured loss or personal contribution," and therefore she recommended he seek personal counsel to advise him, and that it was "possible that the damages from this accident could exceed the limits of [his] bodily injury liability coverage available under" the policy and he could be held personally

liable for any verdict over his policy limits.  In addition to email, Yates sent paper copies via U.S. mail, Federal Express, and hand delivery to the Brandon hotel address and by U.S. mail to the Pensacola address.[4]

On the same day, Sesler told Carman that he had spoken with Rush several times since Friday, that Rush was "aware of who [Sesler] is and why the affidavit is needed," but that Sesler was unsure whether Rush would meet to sign the affidavit. Sesler said he would follow up again that day.  (Doc. 40-2 at 14).  Carman indicated in her notes that she would follow up again with the attorneys at Pennington on July 5, 2017, if she did not hear anything.  (*Id.*).

### Rush Relocates to California and Ceases Communication

Unknown to Progressive or the attorneys, however, Rush had relocated to California on July 3.  *See* (Doc. 42 at 168-69).  After the Fourth of July holiday, Sesler emailed Yates that Rush had stopped communicating with him, and that Carman agreed with him that "we have done all that we can to get the affidavit

---

[4] Both letters indicated that Yates and her firm had been retained to assist with the affidavit, but are inconsistent as to whether they represented Rush or Progressive in that regard.  Carman in her deposition referred in passing to counsel as having been asked to "aid her," but she also stated that defense counsel were hired to "aid Mr. Rush in signing the affidavit." (Doc. 52 at 111).  Moreover, when asked specifically about the issue, Carman made clear that she had not retained the attorneys to represent Progressive, but to represent, or more properly in her view to "assist," Rush with the affidavit.  *See* (*id.* at 36, 38-39, 112-113).  Yates and Sesler both testified they represented Rush, and Yates testified that her letters saying otherwise were the product of clerical mistakes, corrected in later correspondence.  *See* (Doc. 41 at 13-14; Doc. 44 at 56-57, 69, 76, 91, 96-98; Doc. 51 at 43, 76; Docs. 40-11; 40-13; 40-15).  Progressive and counsel engaged in a "collaborative" effort, *see* (Doc. 52 at 38), and both sides in their papers explicitly or implicitly consider the actions and omissions of Progressive and counsel for purposes of analyzing whether Progressive met its legal obligations.  The Court therefore will do the same.  *See Knipper v. Allstate Prop & Cas. Ins. Co.*, No. 8:11-cv-742-T-24TGW, 2012 WL 1004844, at *5 n.5 (M.D. Fla. Mar. 26, 2012) (holding that actions of the counsel hired by the insurer for the insured would be attributed to the insurer for purposes of evaluating whether it acted in good faith).

signed and ultimately feels we can't force him to complete it and sign it if he really doesn't want to." (Doc. 48-13).  Yates responded that she wanted to "make sure we note the file and send him one last ditch effort about lack of communication and cooperation, etc.  CYA for us." (*Id*.).   Sesler's assistant thereupon emailed Rush another letter from Yates and Sesler, which reiterated their and Progressive's continued efforts to resolve the claims against Rush, and indicated that delivery to Deskins of an executed financial affidavit (attached to the email) was a necessary condition to resolution of the claim.  (Doc. 40-11).  The letter emphasized that there had been numerous failed attempts to reach Rush, and that it was important that they speak with him to discuss Plaintiff's demand.  Sesler also noted that Rush's failure to communicate with them was making it impossible for them to resolve the claim against him, but they would continue their efforts.  (*Id*.).

### *Progressive and Counsel Move Forward to Respond to the Demand*

On July 6, 2017, Carman spoke with Deskins to clarify that Plaintiff's time-limited demand related to the policy limits for bodily injury only.  She advised Deskins that Progressive would pay the bodily injury limits, and she further obtained from Deskins an extension of the deadline for the financial affidavit to July 21, 2017.  (Doc. 40-2 at 14-17).  She left a message with Sesler's office telling him about the extension.  (*Id*. at 16).  *She also noted that she had approval for the demand response and would tender the policy limits the following day at Deskins' office if necessary.*  (*Id*. at 17).  Carman called Rush and left a detailed message requesting to meet and discuss the demand, the financial, affidavit, and defense counsel she had hired.  (*Id*. at 15).

Carman also sent Rush, via certified mail and regular mail to the hotel in Brandon, Florida, copies of the time-limited demand letter and the financial affidavit, a letter regarding a conversation between Carman and Rush a week prior, a letter from Carman regarding claim information, and the preservation letter from Deskins, along with a preservation request from Carman.[5] (*Id.* at 18; Doc. 40-13). In the letters, Carman asked Rush to let her know immediately about any other insurance coverage; informed Rush that if the damages exceeded his policy limits, he could be held personally responsible for any verdict over and above his coverage; and informed him he had the right to employ an attorney to represent his interests. The letter again reminded him that Progressive had hired defense counsel on his behalf, but that Rush had ceased communicating with them and that failure to complete the affidavit might lead to Progressive's being unable to settle the claim being made against Rush or obtain a release on his behalf. Carman asked Rush to contact her or defense counsel. (*Id.*).

### *Progressive Tenders Rush's Policy Limits to Plaintiff*

On Friday, July 7, 2017, Progressive hand delivered to Deskins a check for the $25,000 bodily injury policy limits, along with a proposed release of the bodily injury claim. Carman's cover letter to Deskins also confirmed that Deskins had agreed to an extension of the deadline for completion of the financial affidavit to July 21, 2017. (Doc. 40-2 at 18; Doc. 40-14).

---

[5] Claim notes indicate that the documents were also sent to the Louisiana address on the policy. (Doc. 40-2 at 18).

***Counsel Again Reaches Out to Rush Regarding the Affidavit***

On Monday, July 10, 2017, the next business day following Progressive's tender of the policy limits to Plaintiff, Sesler sent to Rush, via email as well as by U.S. mail to the Pensacola address and the hotel in Brandon, an excess letter from Yates, a letter from Sesler, and Deskins' preservation letter, time-limited demand letter, and the financial affidavit. (Doc. 40-15). The letters reiterated that the damages might exceed his policy limits and that Rush could be held personally liable for the excess, and that Sesler, Yates, and Progressive continued to actively engage in efforts to resolve the claims against Rush. They also stated that the demand letter appeared to require Rush's completion of the financial affidavit "to even consider resolution" of the matter, and that Rush's continued lack of cooperation and communication hindered their ability to resolve the claim. (*Id*.). Carman also prepared to move forward with an insurance disclosure to Plaintiff. (Doc. 40-2 at 18-19).

On, July 13, 2017, notwithstanding Rush's lack of engagement, Progressive sent Deskins a sworn insurance disclosure letter, indicating Rush's policy information and limits and stating that it had found no additional insurance for the loss. (*Id*. at 19; Doc. 40-16). The letter also asked Deskins to contact Carman if she felt Progressive had failed to comply its statutory insurance disclosure obligations. (*Id*.)

On July 18, 2017, Progressive continued to attempt to locate Rush by searching online and calling the hotel in Brandon where he said he had been staying. (Doc. 40-2 at 20). Progressive also prepared to provide a response to the

demand by the July 21 deadline.  (*Id*.).  At 2:26 pm, Carman called and left a

message for Sesler to contact her to discuss the demand.   (*Id*.).  At 5:04 p.m., Sesler

emailed Carman to indicate that he had received her message, but that he had not

had any luck convincing Rush to execute the affidavit. (Doc. 40-17).

***Rush Reappears and Agrees to Provide the Affidavit***

On July 19, 2017, with the July 21 deadline for the financial affidavit looming

and no word from Rush, Carman noted that she planned to speak with Sesler

around noon.  (Doc. 40-2 at 20).  At 12:41 pm, Carman noted she had sent Rush an

email asking him to contact her as soon as possible regarding his claim.  (Doc. 40-2

at 20-21).[6]  She then spoke with Sesler, who told her he had not been able to reach

or locate Rush and agreed with Carman's sending a response to Deskins stating

that Progressive had provided the financial affidavit to Rush, but had not heard

back from him.  (*Id*. at 21).

Rush, however, called Carman shortly thereafter.  (*Id*.).  Carman's notes,

entered at 12:52 p.m., reflect that she reminded Rush that she had hired counsel for

him to advise him on the affidavit.  (*Id*.).  She told him that Deskins continued to

request a completed financial affidavit and would not grant an extension, and she

impressed upon Rush that it was imperative that Rush submit the completed

financial affidavit to Deskins by July 21, 2017, all of which Rush indicated he

understood.  (*Id*.).  Rush told Carman that he was not working and did not at that

time have a place to stay in Florida, so he was traveling back and forth between

---

[6] This electronic communication is variously described in the record as a "text, via email,"
as a "text function . . . via email," and as a "text."  *See* (Doc. 40-2 at 20-21; Doc. 41 at 72-73).

Louisiana and Florida.  (*Id*.)  He also stated that he would call Sesler.  (*Id*.).

Carman emailed Sesler to tell him about the call from Rush.  (*Id*.).  Sesler texted Rush and asked to meet for breakfast or lunch the next day, July 20, to go over the affidavit, and advised it was "very important to our efforts to potentially resolve the pending claim against you." (Doc. 40-9 at 5).

On July 20, 2017, at 1:14 am, Rush responded to Sesler's text, stating he was "broke, homeless, jobless and in college" and living in a shelter in California but would complete the affidavit the following day and use a library computer to email it to Sesler.  (Doc. 40-9 at 6).  At 8:16 a.m., Sesler responded, stating he was sorry to hear about Rush's situation, but that once Deskins could see that Rush had no money, she would just "just move on."  (*Id*.).  Sesler emailed Carman relaying the information Rush had just provided about his current living and financial situation as well as his stated intent to complete the affidavit.  (Doc. 48-20).  Carman asked Sesler if he could hand deliver the affidavit to Deskins the next day and planned to discuss the situation with Sesler later that day.  (Doc. 40-2 at 22).  That afternoon, Sesler continued to await the affidavit, and Carman planned to talk to him in the morning to see whether it had been received.  (*Id*.)

### *Rush Refuses to Provide the Affidavit*

The next morning, Friday, July 21, 2017, Carman emailed Sesler to inquire about the status of the affidavit.  (*Id*.).  Sesler texted Rush seeking to follow up on the matter.  (Doc. 40-9 at 7-8).  Sesler reminded Rush that the deadline was 3 p.m. that day, provided Rush his email address, and asked Rush to fill out the financial affidavit as best he could.  (*Id*.).  As of early afternoon, however, Rush still had not

provided a copy of the affidavit.

Then, around 1 p.m., Rush texted Sesler, telling him that he refused to sign the affidavit. Rush deemed the misspelling of his middle name as "Coonga" on Deskins' letter enclosing the affidavit to be a "blatantly racist" remark rather than a typographical error, which made him feel threatened, hurt, and demeaned as an American and a person of color. (*Id*. at 8-9). Rush concluded, "I'm done with this." (*Id*. at 12). Sesler responded to Rush's texts by telling him he would advise the insurance company of Rush's decision. (*Id*. at 10-11). Sesler pointed out, however, that as an African American, he, too, had experienced racism, but he "seriously had to remind himself to stay strong, remained focused, and move on to accomplish my task." (*Id*. at 9, 11-12). Sesler further advised Rush, "You have to remember that in order for us to help ensure that they don't sue you, we need to push through that foolishness and do what we have to do" and "Can't let them win by making u angry and uncooperative." (*Id*. at 13). "Ultimately," however, Sesler texted Rush, "it's your decision though and I will respect it." (*Id*.).

Sesler relayed to Carman by phone that Rush refused to sign the letter. Carman's notes indicate she planned to have Sesler draft a response to Deskins and send the response to Carman, and she would send the response with her own cover letter to Deskins. (Doc. 40-2 at 22).[7] Sesler and Yates then emailed a letter to Carman reporting that "At this time, Mr. Rush feels uncomfortable providing the

---

[7] Both Sesler and Yates later testified regarding their concerns in proceeding that way, including Sesler indicating it was not his responsibility to draft the response to Deskins, and Yates stating that she found it unusual to reply to a demand by attaching an internal communication. (Doc. 41 at 94-96; Doc. 44 at 160-64).

personal information requested in the affidavit." (Doc. 40-18).  The letter did not refer to the issue regarding the racial slur.  Yates testified that she believed that the use of the term "uncomfortable" in the letter was her suggestion and she chose it carefully because she thought it "encompassed many things that were going on over the last 24 to 48 hours." (Doc. 44 at 158-59).  She also testified that she told Carman that she did not think the specific reason for Rush's refusal was something they could divulge to opposing counsel.  (*Id*.).  Carman, for her part, does not recall inquiring as to the specific reason for Rush's refusal to sign the affidavit and stated that she does not believe it was her place to ask such a question.  (Doc. 52 at 140-41, 165).[8]

At some point that same afternoon, Rush himself called Deskins and "screamed" at her regarding the perceived racial slur identifying him as "Kimani Coonga Rush" on her letter requesting the financial affidavit.  (*Id*.; Doc. 49 at ¶¶ 10-11; Doc. 43 at 24-25).  Deskins testified she did not know what Rush was referring to, and as Rush terminated the call abruptly, Deskins had no opportunity to respond or ask Rush any questions.  (*Id*.).[9]

---

[8]  According to Rush, he never felt uncomfortable providing "personal information," that is, "the financial part," but rather only had an issue with the perceived racial slur. (Doc. 42 at 195-96).  As he recalled in his deposition, "And I got this and I saw it and I was reading it and I saw all this like 'Coon' stuff and I'm, like, 'Okay. Well, I don't feel comfortable signing this.'" (*Id*. at 201).

[9]  Deskins did not attempt to correct the asserted spelling error after Rush's call, testifying in her deposition that "there wasn't anything to correct in my view" and "[t]here was no racial slur to begin with, so I didn't think to correct something that never occurred." (Doc. 43 at 24-25).  The record is unclear as to the source of the incorrect spelling.  Deskins testified that after Rush called, she asked her staff about the issue and learned that "Coonga" was "the middle name in the driver's exchange of information," a copy of which Deskins testified she had in her file.  (*Id*. at 24-25).  That document has not been filed in the record.  Deskins' declaration states that she asked her staff to run an Accurint search

Carman faxed Yates' and Sesler's letter to Deskins, with a cover letter indicating that the letter was from defense counsel Progressive had hired for Rush. (Doc. 40-19).  Deskins did not contact Progressive or the attorneys to further discuss the statement in the letter or the call she had received from Rush.  Carman's letter transmitted at 4:03 p.m.  (Doc. 40-19).

### *Plaintiff Files Suit and Rejects a Policy Limits Settlement*

At 4:39 p.m., Deskins filed suit in state court on behalf of Plaintiff against Rush and others involved in the accident.  (Doc. 40-20; Doc. 40-25; Doc. 48-6 at ¶15).  On July 26, 2017, Deskins emailed Carman advising her that "the time has expired for Progressive to accept the terms of the Wiseman's settlement offer to Progressive for their claims against Kimani Rush.  Therefore suit has been filed."  (Doc. 48-26).

On July 27, Deskins emailed Carman, stating that suit had been filed against Progressive's insured due to "Progressive's failure to timely comply with the Wisemans' settlement request."  (Doc. 48-27).  Deskins' email noted that "[t]he Wisemans remain[ed] open to a resolution of the claim," but said nothing about a policy limits settlement and instead stated that "[t]he medical cost of caring for [Wiseman] is extraordinary," detailing Plaintiff's medical bills, his continued recovery, and discussing liability and damages related to the case.  (*Id.*).  Deskins' letter further warned that Progressive's insured was "likely exposed to punitive damages which he would not have been had Progressive timely complied with the

---

on Rush, which she "expected to contain conformation about Mr. Rush's name." (Doc 48-6 at ¶ 11).  However, the Accurint report, filed by Progressive, shows Rush's middle name as "Odonga." (Doc. 40-23).  The Florida Traffic Crash Report submitted by the investigating police officer likewise listed Rush's name as "Kimani Rush" and "Kimani Odonga Rush." (Doc. 48-2).

Wisemans' offer to resolve this matter." (*Id*.).  Although Carman did not document the letter from Deskins in the claim notes, Kris Mancini, the litigation adjuster assigned to the claim, did document it during her review of the correspondence.  *See* (Doc. 40-2 at 24-25).

On August 1, 2017, Deskins sent another letter to Yates and Carman by email and fax, respectively, for the first time disclosing to them the call she had received from Rush on July 21.  (Doc. 40-22)  Deskins' letter asserted that Rush's statements in the phone call complaining about the perceived racial slur "appear[ed] to contradict" the July 21, 2017, letter forwarded by Progressive stating that Rush "[felt] uncomfortable providing the personal information requested in the affidavit."  She indicated in her letter that Rush could have filled out the portions of the affidavit that he felt comfortable with to assist Plaintiff's family with making a "profound decision" on his behalf.  (*Id*.).  Deskins' letter concluded that "[s]ince no affidavit was ever submitted [or portion of an affidavit] and Progressive failed to fully comply with the statute requesting disclosure of insurance information, the Wiseman family had no reasonable way of determining whether the liability limits offered by Defendant on behalf of Kimani Rush were the only available insurance benefits or the only available means to cover the extraordinary damages suffered by Zane Wiseman due to the inarguable negligence of Mr. Rush."  (*Id*. at 2).[10]

---

[10]  Plaintiff's summary judgment response does not argue that any alleged failure by Progressive to supply additional insurance information gives rise to a material issue of fact precluding summary judgment, and any argument on that ground is therefore waived.  *See, e.g.*, *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001) (holding that arguments not made in a summary judgment response are waived).

In a call the next day, August 2, 2017, Deskins told Progressive adjuster Kris Mancini that Plaintiff would not accept the $25,000 policy limits, and that she wanted extracontractual money from Progressive "because she feels that [Progressive] acted in bad faith." (Doc. 40-2 at 26). Deskins also asserted that Progressive should have sent an affidavit to Rush's insurance agent to have the agent fill it out and confirm there was no other insurance. (*Id*.). Mancini advised that Progressive Direct was Rush's agent, that Progressive had verbally verified with Rush that he had no other insurance outside the policy at issue and provided Deskins with a complete policy disclosure. (*Id*.). She also pointed out that Progressive had provided the financial affidavit to Rush, but Rush declined to complete it, that Progressive hired counsel to represent Rush, that the available coverage under the policy was tendered timely, that Rush was not in a position to financially contribute to a settlement, that Progressive would continue to defend Rush in the lawsuit, and that Mancini would review Deskins' request with management and get back to her. (*Id*.).

***Judgment is Entered Against Rush in the Underlying Action***

Deskins proceeded to pursue Plaintiff's claims in the underlying action. Rush remained unresponsive to Carman and Sesler and could not be located by Deskins to serve the complaint, so substituted service on Rush was effected through the Florida Department of State. (Doc. 48-31). Rush eventually became reengaged and submitted the requested financial affidavit at the end of 2018 (it was provided to Deskins around December 6, 2018). Completing the affidavit took Rush only a few minutes. (Doc. 42 at 180, 216). The financial affidavit showed that Rush owned no

assets (other than his Infiniti) and owed student loan debt exceeding $140,000, meaning Rush had a negative net worth.  He earned a small income, and paid monthly expenses equal to or greater than his income.  (Doc. 48-33).

On July 10, 2019, Plaintiff's trial counsel, Henry Valenzuela, sent a letter to Sesler and Yates proposing to settle the lawsuit for $10 million and outlining the asserted basis for a bad faith claim against Progressive.  (Doc. 48-35).  The parties did not settle, but ultimately the parties and Progressive agreed to entry of a stipulated judgment against Rush.  (Doc. 48-37).  In May 2021, the state court entered a judgment in favor of Plaintiff and against Rush in the amount of $3,250,000, with interest accruing at the statutory rate.  (Doc. 40-26).  After entry of the judgment, Progressive paid to Plaintiff the $25,000 bodily injury policy limits, leaving $3,225,000 of the judgment outstanding, with interest continuing to accrue. (Doc. 1-1 at 3).

Plaintiff then filed suit against Progressive in state court, alleging a claim for bad faith and seeking damages for extracontractual liability against Progressive. Progressive removed the case to this Court and now seeks summary judgment, arguing that no reasonable juror could conclude that it acted in bad faith toward Rush and that its conduct was not the cause of the excess judgment against him.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A properly supported motion for summary judgment is not defeated by the existence of a factual dispute. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249-52 (1986).  Only the existence of a genuine issue of material fact will preclude summary judgment.  *Id*.  An issue is not genuine if it is unsupported by the evidence or created by evidence that is merely colorable or not significantly probative.  *Id*. at 249-50.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id*. at 252.

The moving party bears the initial burden of showing that there are no genuine issues of material fact.  *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact.  *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995).  If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true and all reasonable inferences must be drawn in the nonmoving party's favor.  *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

Though the determination of whether an insurer acted in bad faith generally raises an issue of fact for determination by a jury, the Eleventh Circuit and Florida courts "have granted summary judgment where there is no sufficient evidence from which any reasonable jury could have concluded that there was bad faith on the part of the insurer."  *Pelaez v. GEICO*, 13 F.4th 1243, 1251 (11th Cir. 2021) (quoting *Eres v. Progressive Am. Ins. Co.*, 998 F.3d 1273, 1278 (11th Cir. 2021)); *see also Berges*, 896 So. 2d at 680 ("Although the issue of bad faith is ordinarily a question for the jury, this Court and the district courts have, in certain circumstances,

concluded as a matter of law that an insurance company could not be liable for bad faith."). However, if material issues of fact which would support a jury finding of bad faith remain in dispute, summary judgment is unwarranted. *Id.*

## Analysis

### *Controlling Legal Principles*

Florida law imposes a duty of good faith on a liability insurer towards its insured. *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980).[11] This duty arises from the fact that the insured surrenders to the insurer all control over the handling of the claim, including decisions regarding litigation and settlement, *id.*, and the duty exists to protect insureds from judgments in excess of their policy limits when the insureds "have paid their premiums" and have "cooperat[ed] fully with the insurer in the resolution of claims." *See Berges*, 896 So. 2d at 682.

The duty of good faith "obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same." *Boston Old Colony*, 386 So. 2d at 785. It further requires the insurer to "investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a

---

[11] While Florida law recognizes third-party bad faith actions brought by an injured third party against an insured's liability carrier, *see QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 545-46 (Fla. 2012), the basis for the suit remains a claim that the insurer breached its duty to the insured, resulting in the insured's exposure to an excess judgment. *Wachovia Ins. Servs., Inc. v. Toomey*, 994 So. 2d 980, 989 (Fla. 2008).

reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.* The insurer must not only undertake these steps, but must act "diligently, and with the same haste and precision as if it were in the insured's shoes, work[ing] on the insured's behalf to avoid an excess judgment." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 7 (Fla. 2018). In other words, the insurer must act to protect the insured with "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Boston Old Colony*, 386 So. 2d at 785.

Because the duty of good faith involves diligence and care on the part of the insurer in the investigation and evaluation of claims, negligence is relevant to the question of good faith. *Pelaez*, 13 F.4th at 1251. However, "'[n]egligence is not the standard' for evaluating bad faith actions," *id.* (quoting *Harvey*, 259 So. 3d at 9), nor is bad faith demonstrated by evidence that the insurer could have improved its claim handling. *Id.* at 1254; *see also Bell v. Geico Gen. Ins. Co.*, 489 F. App'x 428, 431 (11th Cir. 2012) ("An insurer's simple negligence does not amount to bad faith."); *Campbell v. GEICO*, 306 So. 2d 525, 530 (Fla. 1974) (noting that Florida has "aligned . . . with those states whose standards for determining liability in an excess judgment case is bad faith rather than negligence"); *DeLaune v. Liberty Mut. Ins. Co.,* 314 So. 2d 601, 603 (Fla. 4th DCA 1975) ("[W]hile evidence of negligence may be considered by the jury as it may bear on the question of bad faith, a cause of action based solely on negligence which does not rise to the level of bad faith does not lie."). The fundamental inquiry remains "whether, under all of the circumstances, the insurer could and should have settled the claim within the policy

limits had it acted fairly and honestly toward its insured and with due regard for his interests." *Berges*, 896 So. 2d at 679.

This inquiry looks at the facts of each case and at the "totality of the circumstances." *Id*. at 680; *Harvey*, 259 So. 3d at 8; *Cadle*, 838 F.3d at 1123. The proper focus of the inquiry is on the actions of the insurer rather than on the actions of the insured, the claimant, or the claimant's attorney. *Pelaez*, 13 F.4th at 1251 n.6, 1254. Thus, when the evidence clearly establishes the insurer acted in bad faith, the insurer may not escape liability merely because the insured or the claimant may have contributed to the failure to settle the claim. *Id*. At the same time, while the *focus* is on the insurer's conduct, the conduct of the insured or the claimant is *relevant* as part of the totality of the circumstance. *Id*. at 1254.

Finally, any claimed damages must be caused by the insurer's bad faith. *Harvey*, 259 So. 3d at 7; *see Mesa v. Clarendon Nat. Ins. Co.*, 799 F.3d 1353, 1359 (11th Cir. 2015) (stating that a valid bad faith claim requires a causal connection between the damages claimed and the insurer's bad faith). Accordingly, where alleged bad faith conduct is not a cause of the excess judgment, it is irrelevant. *See Mesa*, 799 F.3d at 1360.

### *Progressive's Handling of the Claim*

The undisputed evidence set forth above shows that Progressive and the attorneys it hired to assist Rush promptly and repeatedly advised Rush as to the possible outcome of litigation, including the possibility of an excess judgment against him for which he would be personally liable, and as to the settlement opportunity presented by Plaintiff's June 29, 2017, demand. They advised Rush of

steps he might take to avoid a judgment, and advised him of his right to obtain separate counsel to represent him.  Progressive also investigated the facts, promptly spoke to witnesses, and hired a reconstruction expert to review Rush's damaged vehicle to determine the likely cause of the accident.  Progressive gave fair consideration to requests from Deskins in an effort to reach a settlement on Rush's behalf, and attempted to settle for policy limits, delivering a check for the entire policy limits to Deskins within eight days of her demand letter.

Progressive went beyond the basic duties outlined in *Boston Old Colony* when it hired counsel to assist Rush with filling out his financial affidavit and sent correspondence to every address on record for him, as well as calling, emailing, and texting him with information pertinent to his claim.  Progressive engaged in these activities against the backdrop of working with an insured who failed to keep Progressive apprised of his location, maintained a transient existence during the relevant period, and repeatedly failed to timely respond to Progressive's and counsel's inquiries and attempts to communicate with him regarding the need to provide the financial affidavit in order to attempt to settle the claim.

Moreover, Progressive undertook all of this activity on Rush's behalf within a very short time frame.  On Thursday, June 29, 2017, Plaintiff's attorney Deskins sent her demand letter requiring a tender of policy limits and the financial affidavit by July 9.  By July 7, Progressive and counsel had spoken with Rush, attempted without success to speak with him further and to meet with him, provided to him at the correct email address the relevant documents and information regarding the claim, including the demand and financial affidavit, tendered the policy limits by

hand delivery of a check to Deskins, and obtained an extension from Deskins for the affidavit until July 21. Plaintiff's offer to settle for Rush's policy limits expired only when Rush, despite repeated advice as to what was required, and at the last minute, flatly refused to submit the required financial affidavit for personal reasons, whereupon Plaintiff immediately filed suit.

This case is similar to *Maldonado v. First Liberty Ins. Corp.,* 546 F. Supp. 2d 1347 (S.D. Fla. 2008), *aff'd,* 342 F. App'x 485 (11th Cir. 2009). In *Maldonado,* as here, the claimant had catastrophic injuries, and the insureds had liability coverage of only $25,000. *Id.* at 1348. The insurer promptly tendered the policy limits, provided the insureds with the proposed financial affidavit demanded by the claimant, and warned the insureds of the possibility of an excess judgment and that failure to complete the affidavit could prevent the insurer from settling the case. *Id.* at 1348-49. The insureds nevertheless refused to sign the affidavit, based on their personal assessment that the claimant was "playing games," that liability had yet to be determined, and that, in any event, they had no assets to satisfy an excess judgment. *Id.* at 1349; 342 F. App'x at 487. Given the refusal, the claimant withdrew the policy limits settlement offer and demanded extracontractual money, filed suit, and obtained a consent judgment against the insureds for $3 million. 546 F. Supp. 2d at 1351. The claimant filed a suit for bad faith against the insurer. *Id.*

The district court (Judge Jordan) granted summary judgment for the insurer. *Id.* at 1357-58. The court pointed out that the insurer had complied with the duties outlined in *Boston Old Colony* because it had warned its insureds of the danger of an excess judgment and of the need to complete the affidavit, had timely tendered

the policy limits, and attempted to settle the case. *Id*. at 1353-54. There was no evidence of the "type of conduct that is essence of bad faith," such as the insurer's trying to avoid or delay or obstruct settlement, or being concerned more with its own interests than those of its insureds. *Id*. at 1354. The court rejected the plaintiff's argument that the insurer had a duty to take additional steps to convince the insureds to change their minds, noting that the court had found no cases imposing such a duty on insurers. *Id*. at 1358-59. The court explained that extending the insurer's duty "that far" was without support and that such a duty would "know no end":

> Ms. Maldonado seems to be arguing for a duty that knows no end. She seems to suggest that whatever would have changed Mr. Clinche's mind to sign the affidavit is what the law required First Liberty to do, and that the alleged failure to push the right buttons to persuade Mr. Clinche constitutes bad faith. I find no support for extending the duty owed by an insurer that far. The estate made its demand, and First Liberty sent a check for the policy limit, reasonably insisted on a release for its insured, counseled its insured to comply with the settlement demand—including execution of the sample affidavit—and warned them of the risks of noncompliance. That was the extent of First Liberty's duty.

*Id*.

The Eleventh Circuit affirmed, reasoning that the insurer had complied with its duties – it had communicated with its insureds regarding the settlement opportunity and repeatedly warned them that failure to submit the affidavit could lead to an excess judgment. 342 F. App'x at 488. The Eleventh Circuit found the situation similar to that in *Boston Old Colony*, 386 So. 2d at 785, in which the Florida Supreme Court held there was no bad faith as a matter of law where the insurer was ready and willing to settle the case, "'and only because of the explicit

request of its own insured did not settle.'" *Id.* (quoting *Boston Old Colony*, 386 So. 2d at 786). Accordingly, the Eleventh Circuit concluded there was no bad faith and the failure to settle was caused solely by the insureds' refusal to execute the financial affidavit and, as such, "no reasonable juror could find that the cause of the failure to settle was attributable to First Liberty." *Id.* at 487-88.

In *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1 (Fla. 2018), in contrast to *Maldonado* and to this case, a policy limits settlement opportunity was missed where the insured was willing to provide the financial information demanded by the claimant, but the insurer "completely dropped the ball" by initially refusing the plaintiff's request outright and then waiting weeks to inform the insured about it. *Id.* at 8-9. When the insured advised the insurer that he would get with his attorney and provide the financial information and specifically instructed the insurer to relay this to the claimant, the insurer failed to get that done. *Id.* at 9. The claimant ultimately filed suit before the financial information was provided. Thus, instead of doing everything possible to settle the case, the insurance adjuster was "a considerable impediment" both to the insured and the plaintiff. *Id.* The Florida Supreme Court therefore held the trial court's directed verdict for the insurer was erroneous. *Id.* at 12.

Similarly in *Moore v. GEICO Gen. Ins. Co.*, 633 F. App'x 924 (11th Cir. 2016), the Eleventh Circuit reversed a grant of summary judgment for the insurer where the insurer failed to provide its insured with the claimant's demand letter and failed to prepare a financial affidavit and release that complied with the requirements of the demand. *Id.* at 929. Upon receipt, the claimant treated these

variations from his demand as amounting to a rejection and counteroffer, which he declined to accept and instead filed suit against the insureds. *Id.* at 927.

Bad faith turns on the particular facts of the case, and this case is like *Maldonado* and unlike *Harvey* or *Moore*. As in *Maldonado*, Progressive provided Rush with everything he needed to provide the financial affidavit to Plaintiff's counsel by the extended deadline, and, as in *Maldonado*, Rush simply refused to provide it for reasons of his own. Unlike *Harvey*, Progressive did not "drop the ball" by refusing or delaying efforts to comply with the claimant's demand or by failing to follow through on the insured's request that it convey to the claimant's counsel that the insured would provide the affidavit. Unlike *Moore*, Progressive did not disregard Plaintiff's demands with regard to the drafting of an affidavit or affirmatively cause the failure to comply with the demand. Instead, the insured's decision and less-than-conscientious actions made it impossible to comply with Plaintiff's demand. As in *Maldonado*, the record does not support a conclusion that Progressive acted in bad faith.

### Plaintiff's Arguments

Plaintiff in Paragraph 34 of his response, subparagraphs (A) through (F), points to evidence from which he argues a reasonable jury could conclude Progressive acted in bad faith. None of Plaintiff's arguments reveals a genuine issue of material fact.

(A). Plaintiff argues that Progressive did not "promptly" provide Plaintiff's demand letter to Rush, explain the need for the financial affidavit, or meet with Rush. But the record conclusively demonstrates that Progressive and the counsel it

hired to assist Rush provided him with Plaintiff's demand letter, informed him of its significance, and tried to meet with him and otherwise assist with the affidavit. Rush received all relevant documents and information by email well in advance of the July 21, 2017, extended deadline with sufficient time left for him to complete the affidavit. (Doc. 42 at 201-03).[12]  There is no evidence that Rush, a college-educated adult with legal training, did not appreciate what was required or its significance. *See* (*id*. at 174-75).  He simply chose not to comply for personal reasons.  Nor is there any evidence to support a conclusion that Progressive's providing documents and information to Rush when it did and in the way it did had any causal connection to the failure to settle the claim.  Accordingly, even if Progressive's performance in this regard had been deficient, it would be irrelevant. *See Mesa*, 799 F.3d at 1360 (holding that any negligence by the insurer in failing to keep its insured advised "was not the cause of the excess judgment, and is therefore immaterial.").[13]

---

[12] In light of the conclusive record evidence on this point, Rush's testimony that he did not *recall* receiving copies of the demand letter and affidavit from Progressive within the 30 days following June 29, 2017, and his lack of recollection or minor confusion over the dates of various events when asked about them at his deposition more than two years later, *see* (Doc. 42 at 178-79; 189), does not constitute significantly probative evidence that he failed to timely receive these documents.

[13]  Plaintiff argues that he need not establish causation because the parties' agreement for entry of judgment against Rush in the state court action stipulated that "[t]he reasonableness or the legal cause of the above Final Judgment will not be contested in the bad faith litigation which will be filed by Rush or Wiseman against Progressive." (Doc. 48 at 17-18; Doc. 48-37).  However, paragraph 14 of the same agreement expressly preserves all claims and defenses except for specific issues not relevant to this case.  The provision cited by Plaintiff, read in context and in light of the agreement as a whole, does not preclude Progressive from arguing that the way it handled the claim against Rush did not cause the failure to settle the claim for policy limits, and therefore was not a cause of the excess judgment.

(B)    Plaintiff cites the July 5, 2017, email exchange between attorneys Sesler and Yates referring to "CYA for us," but that language is not probative of bad faith by Progressive.  It simply recognized the situation Rush's lack of cooperation and communication had put them in.  There is no conflict between Progressive and counsel working diligently to settle the claim while simultaneous warning Rush about the impact his lack of cooperation might have.

(C)    Plaintiff points to letters from the Pennington firm to Rush that were inconsistent as to whether the firm represented Rush or Progressive.  It is undisputed that some letters reflected a mistake in that regard, which was corrected in later correspondence.  The error amounts to simple negligence at most, and once again, there is no evidence this mistake contributed to the failure of the case to settle for policy limits.

(D)    Plaintiff argues that from July 6, 2017, to July 19, 2017, "Progressive failed to make any efforts to communicate or meet with Mr. Rush to secure the completed affidavit."  But Progressive and counsel had already communicated with Rush and attempted to communicate with him to secure the affidavit on multiple occasions from June 29 to July 6, and tried again on July 10, with no response from Rush.[14]  And, again, there is no evidence from which a jury could find a causal connection between the relative lack of documented activity by Progressive during this period and the failure of the case to settle for policy limits.

---

[14]    Specifically, on July 10, 2017, the next business day following Progressive's tender of the check for Rush's policy limits, attorney Sesler once again tried to reach Rush, emailing to him an excess letter from Yates, a letter from Sesler, Deskins' preservation letter, the time-limited demand letter, and the financial affidavit.  (Doc. 40-15).

(E) Plaintiff next raises what he calls the "colossal error" by Progressive and the "turning point" in its handling of the claim against Rush. (Doc. 48 at 7, 13). He argues that Progressive acted in bad faith when it sent Deskins the letter of counsel reporting that Rush refused to complete the financial affidavit because, as Plaintiff frames it, he was "'uncomfortable providing personal information.'" (Doc. 48 at 13). Plaintiff argues the letter was "false and misleading," and points to the report of his expert Susan Kaufman opining that it was a violation of industry standards and Progressive's own policy requiring truthful communications with claimant's counsel. (*Id.* at 13-14). The Court rejects these arguments.

No reasonable jury could conclude Progressive's and counsel's July 21, 2017, letter relating Rush's refusal to complete the affidavit was false or misleading. Contrary to Plaintiff's attempted rewrite of the letter from counsel, it did not state that Rush "declin[ed] to complete the affidavit *because he was 'uncomfortable providing personal information.'*" *See* (*id.* at 13) (emphasis added). That language would suggest that Rush refused to sign the affidavit *because* it requested information that was personal. The letter, however, stated he was "uncomfortable providing the personal information requested in the affidavit." (Doc. 40-18). As actually written, the letter says that Rush is uncomfortable providing the requested information and that the information is personal, but it does not say *why* Rush was uncomfortable. In his deposition, Rush expressly testified that at the time he did not feel "comfortable" executing the affidavit. (Doc. 42 at 201) ("And I got this and I saw it and I was reading it and I saw all this like 'Coon' stuff and I'm, like, '*Okay. Well, I don't feel comfortable signing this.*'") (emphasis added). The reference to

Rush being "uncomfortable" was therefore accurate.  The description of the requested information he refused to provide as "personal" information was also accurate, as the affidavit required extremely detailed information about income, expenses, assets, liabilities, and employment status (including, if unemployed, efforts to find employment).  *See* (Doc. 40-5).

The report of Susan Kaufman, Plaintiff's insurance industry expert, does not create an issue of fact on this point, for several reasons.

First, Kaufman opines that Progressive and counsel should have advised Plaintiff's counsel that Rush was "homeless, jobless, and living in a shelter" and that he refused to sign the affidavit because of a perceived racial slur, and that they should have sought an additional extension of time to obtain the financial affidavit. *See* (Doc. 48-38 at 26, 42).  Kaufman effectively seeks to impose on Progressive a legal duty to try to persuade Plaintiff to modify the terms of his settlement demand by disclosing to Plaintiff's counsel, without its insured's permission, the very information the insured had refused to disclose.  The Court rejects such a duty as a matter of law.  The duty of good faith is imposed to protect insureds who have delegated decisions regarding settlement and claim handling to the insurer, and who have cooperated in trying to settle the case.  *Berges*, 896 So. 2d at 682. Extending the duty of good faith to this situation would be inconsistent with the reason the duty exists.  Just as the court in *Maldonado* found no support in Florida law for a duty to try to change a recalcitrant insured's mind on providing financial information, there is no basis in Florida law to impose a duty on Progressive to try to "push the right buttons" to change Plaintiff's mind about the clear terms of his

demand in order to remedy conduct by the insured that made it impossible to comply. *See Maldonado*, 546 F. Supp. 2d at 1359. Because the Court holds there is no legal duty, Kaufman's testimony that Progressive's handling of the letter violated industry standards is legally irrelevant and does not create an issue of fact on bad faith.

Second, Kaufman's opinion that the letter to Plaintiff's counsel, rather than being "truthful," instead "misrepresented" Rush's reasons for refusing to complete the affidavit, does not constitute proper expert testimony. As shown above, the letter was accurate, even though it did not explain the specific reason for Rush's refusal, and in any event, offering an opinion that a party made "misleading'" statements does not constitute proper expert testimony. *See Redding v. Coloplast Corp.*, No: 6:19-cv-1857-Orl-41GJK, 2020 WL 13882977, at *8 (M.D. Fla. Nov. 30, 2020) (citing *Plott v. NCL Am., LLC*, 786 F. App'x 199, 203 (11th Cir. 2019)). Similarly, to the extent Kaufman's reference to "good faith industry standards" and "good faith duties" purports to offer an opinion that Progressive did not act in good faith, the Court rejects this testimony as an impermissible legal conclusion. *See, e.g.*, *Kearney v. Auto-Owners Ins. Co.*, No. 8:06-cv-595-T-24TGW, 2009 WL 3712343, at *10 (M.D. Fla. Nov. 5, 2009) ("An expert cannot testify in a bad faith claims handling case to the ultimate legal conclusion that the insurance company did or did not 'act in bad faith.'"), *aff'd*, 422 F. App'x 812 (11th Cir. 2011).

Even limiting Kaufman's opinions to compliance with industry standards, she fails to point to any specific standard or offer any explanation how her education, training or experience would allow her to reliably apply the very general

industry and legal standards she cites to the specific record facts.  *See, e.g.*, *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc) (holding that an expert relying on experience must explain how the experience leads to the conclusion in a reliable way).  Without such support, her opinions simply reflect her subjective reaction to the facts presented in the record, supported only by her own say-so.  *See id*. ("If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.").  In addition, her opinions address concepts well within the understanding of the average lay person and amount to little more than what counsel could argue in closing argument.  *See Mason v. State Farm Mut. Auto. Ins. Co.*, No. 8:20-cv-2912-KKM-TGW, 2022 WL 4230055, at *8 (M.D. Fla. June 29, 2022) (concluding that testimony by Ms. Kaufman that the defendant insurance company had presented "obstacles to settlement" by failing to explain insurance information it provided to the plaintiff's counsel could be disregarded because it addressed matters within the understanding of a lay jury), *report and recommendation adopted*, 2022 WL 3098387, at *1 (M.D. Fla. Aug. 4, 2022) (holding that Kaufman's testimony was properly disregarded).

Third, even accepting Kaufman's criticism of the language used by Progressive and counsel in the July 21, 2017, letter as a violation of industry standards, under the totality of the circumstances and on the facts of this case, no reasonable jury could conclude that it amounted to anything beyond mere negligence.  *See Mason*, 2022 WL 3098387, at *1 (holding that even if Ms. Kaufman's testimony were considered, the totality of the circumstances would not

permit a reasonable jury to conclude the insurer acted in bad faith); *Baranowski v. GEICO Gen. Ins. Co.*, 385 F. Supp. 3d 1267, 1276 n.7 (M.D. Fla. 2019) (holding an expert opinion that insurer deviated from the standard of care did not create a disputed issue of material fact as to the insurer's bad faith), *aff'd*, 806 F. App'x 971 (11th Cir. 2020).

(F)     Plaintiff's final point is that Progressive acted in bad faith when it "missed" opportunities to settle for the policy limits after the July 21, 2017, deadline passed.  The record does not support the existence of any such opportunities. Deskins told Progressive in her July 26, 2017, email that "the time has expired for Progressive to accept the terms of the Wiseman's settlement offer," and that suit had been filed.  The next day she told Progressive by email that Plaintiff was "open to settlement," but in contrast to her June 29, 2017, demand, she omitted any reference to a policy limits settlement and instead extensively discussed the "extraordinary" damages Wiseman had suffered and threatened punitive damages. No reasonable insurer would view this as a continued openness to settle for policy limits, and there is no evidence Progressive did so.  The only reasonable conclusion was that the opportunity to settle for the $25,000 policy limits was off the table, and Deskins expressly confirmed that was the case when Progressive's adjuster Kris Mancini inquired on August 2.

## Conclusion

Did Progressive handle Rush's claim perfectly?  No.  However, perfection is not the standard.  At most, counsel provided to Rush by Progressive *may* have acted negligently by drafting the July 21, 2017, letter relaying Rush's refusal to sign the

financial affidavit in a way that could be misinterpreted.  But negligence, while relevant, is not the standard.  *Pelaez*, 13 F.4th at 1251; *Harvey*, 259 So. 3d at 11. Furthermore, when an allegation of racism is made, as Rush did here in refusing to sign the financial affidavit, counsel should not be faulted for treading lightly.  It would have been foolish for them to have done otherwise.

Here, it was the insured, not Progressive, who controlled the critical decision and the critical action to be taken to settle the case – filling out and submitting the financial affidavit.  Rush decided not to provide the affidavit.  Nonetheless, Rush's actions would not have let Progressive off the hook *if there were any evidence clearly establishing that Progressive acted in bad faith.  See Harvey*, 259 So. 3d at 11; *Pelaez*, 13 F.4th at 1250.  But no such evidence exists in this case.  Even viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, in light of the totality of the circumstances, no reasonable juror could find that Progressive acted in bad faith in the handling of the claim against Rush.  While the Court certainly empathizes with the unfortunate situation Plaintiff finds himself in, the Court's empathy cannot transform this case into something it is not.

Accordingly, it is hereby

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1) "Progressive Paloverde Insurance Company's Motion for Summary Judgment" (Doc. 40) is hereby **GRANTED**.

(2) The Clerk is **DIRECTED** to enter final judgment in favor of Defendant

Progressive Paloverde Insurance Company and against Plaintiff Zane

Wiseman.

(3) Following the entry of judgment, the Clerk is directed to terminate any

pending motions and deadlines, and thereafter close this case.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 22d day of

December, 2023.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**